UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| MICHAEL F. McNALLY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:12-cv-00063-TWP-WGH |
| | ) |
| | ) |
| AZTAR INDIANA GAMING | ) |
| COMPANY, LLC d/b/a CASINO AZTAR, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Michael McNally ("McNally"), by counsel and pursuant to Fed. R. Civ. P. 56 and Local Rule 56-1, respectfully submits his Response in Opposition to the Motion for Summary Judgment filed by Defendant, Aztar Indiana Gaming Company, LLC d/b/a Casino Aztar.

**I. PRELIMINARY STATEMENT**

For purposes of summary judgment, this case involves one main issue: Whether Defendant terminated McNally's employment for an unlawful reason: because Defendant regarded or perceived McNally as disabled as prohibited by the Americans with Disabilities Act.[1] McNally's evidence is legally sufficient to raise a genuine issue of material fact that Defendant's perception of him as disabled led to Defendant's decision to terminate his employment, precluding the grant of summary judgment as a matter of law.   In sum, McNally presents a cause of action for trial.   Since the Court is to consider the facts presented at the summary judgment

---

[1] McNally does not proceed upon the claim that Aztar terminated him because he was disabled, but only on the claim that Aztar terminated him because it regarded or perceived him as disabled.

stage in the light most favorable to McNally and draw all reasonable inferences from the evidence in favor of McNally, Defendant's Motion should be denied.

## II.     STATEMENT OF DISPUTED MATERIAL FACTS

1. Prior to his employment at Aztar, McNally was a Bridge Mate at Grand Victoria Casino in Elgin, Illinois. McNally was terminated from his employment at Grand Casino for having an attitude not conductive to a pleasant work environment. [Def.'s Br. p. 3, ¶ 5]

**Dispute:** McNally objects on the grounds of relevance, immateriality, and confusion of the issues. McNally's previous employment has nothing to do with the reason for Defendant's termination of him in August, 2011. He worked at the Grand Victoria Casino from October, 1994 until June of 1995, over 16 years prior to being terminated from Defendant. [Def.'s Ex.2, McNally Dep., p. 9] This kind of character evidence is inadmissible. Fed.R.Evid. 401.

2. Prior to his termination, McNally received written discipline at Aztar for failure to attend a mandatory meeting in 1996. [Def.'s Br., p.3, ¶ 8]

**Disputed:** McNally objects on the grounds of relevance, immateriality, and confusion of the issues. This discipline occurred 15 years prior to Aztar's termination of McNally. There is no evidence that this discipline had anything to do with the termination. Defendant's attempt to use this alleged act by McNally fifteen years prior to his termination to show that he acted in the same way later is not permitted under the Federal Rules of Evidence. Fed.R.Evid. 401.

3. Shaw terminated McNally due to McNally's improper use of his manager comp privileges, his failure to cooperate with an investigation, falsification of the manager comp receipt, and unauthorized breaks and leaving work area. [Def.'s Br., p. 4, ¶ 10]

**Disputed:** McNally contends that the reasons Defendant has proffered are pretext for discrimination unlawful under the ADA. In support thereof, he points to evidence designated in

this response.  By way of example, McNally had no points for attendance and did not receive any warning from Shaw for any reason, including attendance or improper use of comps. [Def's Ex. 1, Shaw dep., p. 47].  He used his comp in a manner that was consistent with the way that Shaw and others used their comps, and yet this was the only occasion in which Shaw determined a comp was not used for a reasonable business purpose. [Pl. Ex 1-3; McNally dep., pp. 24-25, 27; Shaw dep., pp. 31, 49].  He mistakenly wrote a vendor's name on a receipt, and explained his mistake immediately when Shaw questioned him.  [McNally dep., pp. 24, 52, 65; Shaw dep., p. 59]. Defendant fails to designate any evidence to support its allegation that McNally failed to cooperate with an investigation.

    4.    Shaw noticed a repeated pattern that McNally was frequently unavailable and off Aztar property when Shaw was looking for him. [Def.'s Br., p. 4, ¶ 11]

**Disputed:** McNally objects to this self-serving and uncorroborated statement.  Mr. Shaw also testified that McNally was responsible for an area of over 20 acres of land, buildings, and boats, and that he would only ask McNally's administrative assistant and manager where McNally was if he saw them. [Shaw dep., pp. 53, 60-2].

    5.    In addition to McNally, Shaw terminated the Warehouse Manager for unauthorized breaks and leaving the work area ("Manager"). (Def. App., Ex 1, Shaw Dep., p. 23, lines 4-14) Shaw terminated the manager in early 2012.  Similar to McNally's termination, the Manager was leaving property for extended periods of time and not informing his direct report of his absence or gaining approval for the absence. [Deft.'s Br., p. 4, ¶ 14].

**Disputed:** McNally objects on the grounds of relevance, immateriality, and confusion of the issues.  There is no similarly situated element for employers.  Even if there were, the Warehouse Manager was not similarly situated to McNally, the Director of Facilities/Marine Services. McNally was responsible for an area of over 20 acres of land, buildings, and boats. [Shaw dep.,

p.53]. Moreover, while Shaw directly supervised McNally, the Warehouse Manager was supervised by Director of Finance Jennifer Morgan. [*Id.* at 23]. Morgan recommended the Warehouse Manager's termination, and was not involved in McNally's termination. *Id.*

McNally also disputes that he did not notify the proper individuals that he was going to be absent. Neither his behavior nor his job duties are comparable to the Warehouse Manager. First of all, McNally did not have any set hours. [Shaw dep., p. 62]. Moreover, he had told Shaw when Shaw became his supervisor that as a single father, he would have to leave by 3:00 on Tuesdays and every other weekend to pick up his children. [McNally dep., p. 50]. He also told Shaw that he was going to leave on July 11, 2011 to attend a golf outing for him. [Shaw Dep., p. 60; McNally Dep., pp. 48-9 and 67]. Shaw would only ask McNally's administrative assistant and manager where he was if he saw them. [Shaw dep., pp. 61-2]. He would not ask his own secretary, though he acknowledged it would be acceptable for McNally to tell her he was going to be absent, as he assumed she would tell him. [Shaw dep., p. 45].

6. When monitoring McNally, Pressley prepared a log of McNally's arrival and departure times on July 11, 2011 through July 27, 2011 by watching the facilities' video footage. [Deft.'s Br., pp. 4-5, ¶ 16].

**Disputed:** McNally disputes that the video footage would accurately reflect his arrival and departure times, as McNally was responsible for an area of over 20 acres of land, buildings, and boats, not all of which is covered by camera. [Shaw dep., p. 53]. Moreover, Defendant failed to preserve the videotape evidence, despite the fact that it was put on notice of McNally's claims in his EEOC Charge filed on October 7, 2011, about two months following its termination of McNally. [Shaw dep., p. 31; Pl. Ex. 9].

7. On July 27, McNally arrived late with only five or ten minutes left of a disaster

        drill, despite that it was his primary responsibility to coordinate the drill. [Deft.'s Br., p. 5, ¶ 18].

**Disputed:** The disaster drill was not primarily McNally's responsibility, it was the captain's responsibility. [McNally dep., p. 71]. Moreover, the recording on which this statement relies no longer exists.

        8.    McNally acknowledges that Shaw instructed all SLT (Senior Leadership Team) members to:
Let Ward know if they will be gone off property for an extended time during the work day . . . [Def.'s Br., p. 5, ¶ 19].

. . . McNally believes the only time he was required to inform Shaw of his absence . . . [Def.'s Br., p. 5, ¶ 20]
When pressed, McNally acknowledged that Shaw expected McNally to inform him if McNally intended to take a half day off of work, but continues to deny any responsibility to inform his supervisor of any other extended absence from Aztar's facility during the work day. [Def.'s Br., p. 5, ¶ 21].

**Disputed:** McNally objects to Defendant's characterizations that McNally was required to inform Shaw as to *extended* absences from Aztar's facility as misleading and confusing. Shaw admitted that McNally had no set hours and that McNally was responsible for an area of over 20 acres of land, buildings, and boats. [Shaw Dep., pp. 53, 62]. Shaw also admits that McNally was only expected to notify *someone* who might get word to Shaw if McNally was going to be gone for an *extended* period of time during the day. [Shaw Dep., p. 45]. Aztar did not require McNally to tell Shaw directly of any extended absence. Moreover, nowhere did Shaw or Aztar define what is meant by an "extended" absence. McNally's understanding, that he was required to let someone know if he was going to be absent from the facility for a half day or more, is not directly refuted anywhere in the record.

        9.    On July 12, 2011, McNally left work at Aztar at 13:27 in order to collect documents that his insurance company demanded in the course of its investigation

of McNally's house fire. McNally did not tell Shaw of his absence and believes he had no obligation to do so. [Def.'s Br., p. 6, ¶ 22]

**Disputed:** Plaintiff objects to this statement as misleading. Shaw admits that McNally had no duty to tell him unless he was going to be absent for an extended period of time, and even then could notify *someone* who might get word to Shaw if Shaw was unavailable. [Shaw Dep., p. 45]. McNally told Shaw's administrative assistant, his own administrative assistant, and his manager that he was leaving early on July 12, 2011 to gather the documents for his insurance company. [McNally dep., p. 68]. Moreover, the recording on which this statement relies no longer exists.

10. Those utilizing comp privileges were required to write the reason the comp was used and who was involved on the particular comp receipt. [Def.'s Br., p. 7, ¶ 27].

**Disputed:** Shaw testifies only that managers and directors "are supposed to" put the reason for the comp and individuals involved on the receipt. [Shaw dep., p. 29]. There was no written policy requiring it. [Shaw dep., p. 30]. A review of manager and director comp receipts reveals that most comp receipts did not, in fact, include any reference to either a reason or the individuals involved. [Pl. Ex. 1-3].

11. McNally admits that Shaw had instructed the Aztar Directors regarding the use of comps and recalls Shaw's instructions to be:
We need to use our comps sparingly, we are probably the highest paid group on property, and we should not be comping a luncheon buffet, when a $7 an hour housekeeper is behind us in line, and he gave us reasons to use a comp: for entertaining vendors, special guests, managers' meetings, is all I recall right now. [Def.'s Br., p. 7, ¶ 30].

**Disputed:** This statement is incomplete and misleading. Ward Shaw admitted that there was not an exhaustive list of what was and was not a proper occasion for comping. [Shaw dep., p. 50-51]. In approximately June, 2011, Shaw took the SLT senior leadership team and guests to Blush

-6-

Ultra Lounge for drinks and appetizers. [McNally dep., p. 27; Shaw dep., p. 49]. Thereafter, the group went to Hoosiers Lounge for karaoke night, where Shaw and directors Matt Pressley and Wade McNeill bought drinks for various groups of people on their manager comps. [McNally dep., p. 27].

>   12.  McNally acknowledges that it was required that he write the names of the persons who accompanied him on the receipt at the time he utilized his manager comp privileges. [Def.'s Br., p. 8, ¶ 36].

**Disputed:** Plaintiff objects to this statement as misleading. McNally stated that it was his practice to write down the names of who was in attendance and for whom the comp was utilized. [McNally dep., p. 24]. Most managers and directors did not. [Pl. Ex. 1-3]. For large groups, the practice was to just write the reason for the gathering. [McNally dep., p. 25]. Many managers and directors did not write down the names of individuals present, and some did not write down the reasons on comps for large parties. [Pl. Ex. 4]. There was no written policy as to what was to be written on comp receipts. [Shaw dep., p. 30].

>   13.  McNally's counseling records with counselor, Richard Rust, who is the only counselor or medical professional McNally alleges to have seen for his alleged mental disability, do not reveal any diagnosis or reference to depression . . . [Deft. Br., p. 10, ¶ 49].

**Disputed:** McNally objects to this statement as incomplete and misleading. His counseling records do reference that he suffered from adjustment disorder with anxiety. [Deft.'s Ex 3, pp. 13, 18, 21, 24].

>   14.  McNally believes Aztar employee, Sara Lipking, knew that he suffered from mental impairment because she witnessed him cry and acknowledged that he "was going through a lot" on an isolated occasion. [Deft.'s Br., p. 11, ¶ 52].

**Disputed:** This statement is incomplete and therefore misleading. Importantly, Lipking was

not just a co-employee but was Defendant's Director of Human Resources with whom Shaw discussed McNally's termination. [Shaw Dep., 41, 44]. Moreover, Lipking initiated this meeting because of her concern about McNally. McNally's house burned down in February, 2011 and he initiated a child custody proceeding against the mother of his daughter, who was not yet two years old, in March 2011. [McNally dep., 36-7]. Lipking knew the "emotional roller coaster" McNally was on. [*Id.* at 36].

    15.    The only fact that McNally believes led Shaw to conclude McNally suffered from a mental impairment is that Shaw was "smart-alecky" to McNally involving a facility renovation." [Deft.'s Br., p. 11, ¶ 54].

**Disputed:** This statement is incomplete and misleading. As McNally alleged in his Complaint, when Shaw terminated McNally, Shaw said, "I know you're going through a lot. I suggest you get some professional counseling." [Complaint, ¶24, McNally dep., p. 32]. Shaw knew that McNally's house had burnt down in 2011, and that he was going through a custody fight regarding one of his children. [Shaw dep., pp. 68-69].

    16.    McNally submitted to a required medical examination and evaluation as required to maintain his coast guard licensure on March 21, 2011 and did not disclose any mental impairment despite the requirement that he do so to the extent that he believed he suffered from such a disability or impairment. [Deft.'s Br., p. 11-12, ¶ 55].

        McNally provided information to the medical examiner of his previous bone surgery, a previous bone fracture, and allergic reactions, but the medical records reveal no disclosure of depression or any "other psychiatric disease or counseling," despite that there were specific questions relating to each. [Deft.'s Br., p. 12, ¶ 57].

**Disputed:** Plaintiff objects to these statements as incomplete, misleading, and not relevant to his regarded as claim. Defendant infers that McNally was being untruthful, but he testified that he believed at the time he filled out the application, that his mental health was fine. [McNally

-8-

dep., p. 44].

### III. PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

1. Defendant has a points policy for attendance violations. [Pl. Ex. 6].

2. McNally had not been assigned any points for attendance violations, nor was he warned about his attendance prior to his termination. [Shaw dep., p. 47].

3. McNally wrote "Shekell" on the receipt at the Blush Ultra Lounge on July 28, 2011 by mistake. When Ward Shaw asked him about it, he immediately explained that he had been talking to the bartender about Shekell and writing on the receipt at the same time. [McNally dep., pp. 24, 52, 65; Shaw dep., p. 59].

4. Of 1327 pages of manager comp. receipts for the period from May through August, 2011, over half do not indicate the reason for the comp. [Pl. Ex. 1-3]. An additional eleven comp receipts which are obviously for large parties lack the names Defendant argues were required to be listed, and several of those also lack any reason for the gathering. [Pl. Ex 4] For example, on May 11, 2011, a manager comp was submitted for food and drinks totaling $1537.38. The comp receipt does not reference any names of individuals, any reason for the comp, or even what manager authorized the comp. [Pl. Ex. 4, p. 1-3].

5. Shaw has been Defendant's general manager since May of 2010. [Shaw dep., p. 12]. McNally's comp of July 28, 2011 was the only time that Shaw determined that a director comp was not used for a reasonable business expense. [Shaw dep., p. 31]

6. Shaw never gave McNally a warning about his use of comps. [Shaw dep., p. 47].

7. McNally received a bonus for his good work in 2010. [McNally dep., p. 58].

8. Carl Guerry replaced McNally as Director of Facilities and Marine Services.

Defendant is not aware of whether Guerry suffers from any physical or mental impairment. [Pl. Ex. 5, Defendant's Answer to Plaintiff's Interrogatory No. 14©].

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if there "is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. The court makes this determination only after the moving party bears its "initial burden of directing the district court to the determinative issues and the available evidence that pertains to each." *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). The burden rests squarely with the moving party to demonstrate that there is an absence of evidence to support the nonmoving party's case. *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994). To withstand summary judgment, the nonmovant need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994). The record and all reasonable inferences that may be drawn from it are viewed in a light most favorable to the party opposing the motion. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-52 (1986). In the context of summary judgment under Rule 56, the court must review the record "taken as a whole." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). Although a judge's evaluation of the evidence on summary judgment may be a good predictor of the plaintiff's success in an eventual <u>bench</u> trial, it is not an appropriate predictor in an eventual <u>jury</u> trial. *Shager v. Upjohn Co.*, 913 F.2d 398, 403 (7th Cir. 1990).

In an employment discrimination case, an employee can survive a motion for summary

judgment on the issue of pretext if he produces evidence that calls into question the employer's proffered reasons for dismissal. *O'Connor v. DePaul University,* 123 F.3d 665, 670 (7th Cir. 1997). "If the employee succeeds in casting doubt on the proffered reasons for dismissal, the ultimate question of whether the employer discriminated against the employee must be left for a jury to consider. Because employment discrimination cases often turn on questions of intent and credibility, courts in these cases must take care as they weigh summary judgment motions not to invade the province of the fact finder by attempting to resolve swearing contests and the like." *Giannopoulos*, 109 F.3d at 410. In these types of cases, a Court should scrutinize a motion for summary judgment even more rigorously. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993). If the employee casts any doubt on the proffered reasons for dismissal, the ultimate question of whether the employer discriminated against the employee must be left for the finder of fact. *O'Connor*, 123 F.3d at 670.

## V.  DISCUSSION

### A. Defendant Regarded McNally as Disabled

In an action for disability discrimination, "an individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C.A. § 12102(3)(A); *Steffen v. Donahoe,* 680 F.3d 738, 744 (7th Cir. 2012).

The case law that Defendant cites to in arguing that Plaintiff was not "regarded as" disabled is misplaced. The "but for" standard is not a standard applied to a determination of whether an individual is regarded as disabled, as Defendant argues, but the standard on causation.

[Deft.'s Br., p. 18, citing *Serwatka v. Rockwell Automation, Inc.,* 591 F.3d 957, 963 (7th Cir. 2010) and *Nayak v. St. Vincent Hospital and Health Care,* 2013 WL 121838 (S.D.Ind. 2013)]. Similarly, the "stray remarks" language that Defendant cites is applied to remarks of non-decisionmakers which plaintiff claimed showed discriminatory animus, not the plaintiff's status as disabled or regarded as disabled. [Deft.'s Br., p. 19, citing *Kantrowitz v. Uniondale Union Free Sch. Dist.*, 822 F. Supp. 2d 196, 215 (E.D.N.Y. 2011)].

 In the course of telling McNally's he was terminated , General Manager Ward Shaw told McNally that he knew McNally was going through a lot, and that McNally should seek professional counseling. It is axiomatic from this statement that Shaw believed that McNally had a mental impairment which professional counseling would be necessary to treat. Shaw was aware that McNally's house had burnt down in February 2011, and that he had initiated a custody fight regarding his daughter, who was not yet two years old, in March 2011. Moreover, in May, 2011, Human Resources Director Sara Lipking had initiated a meeting with McNally because of her concern for him, and knew the "emotional roller coaster" McNally was on. Shaw discussed McNally's termination with Lipking. Shaw's statement to McNally that he should seek professional counseling, in the very same conversation in which Shaw terminated McNally and in context with Lipking's expression of concern for how McNally was doing creates an inference that Shaw regarded McNally as suffering from a mental impairment for which Shaw terminated him. The facts are sufficient for a reasonable jury to conclude that Defendant regarded McNally as disabled.

## B. Plaintiff Can Prove His ADA Claim
## Under the Direct Method of Proof

McNally opposes Defendant's motion for summary judgement alternatively under both the direct and indirect methods of proof. Plaintiff can prove his claim under the direct method by constructing a "convincing mosaic" of circumstantial evidence that allows a jury to infer intentional discrimination. *Hobgood v. Illinois Gaming Bd.*, 11-1926, 2013 WL 3599498, *7 (7th Cir. July 16, 2013). Circumstantial evidence may suffice under the direct method when a plaintiff provides proof of " "suspicious timing, ambiguous statements oral or written, ... and other bits and pieces from which an inference of intent might be drawn." *Id.* This evidence, when viewed as a whole and viewed in a light most favorable to Plaintiff's case, could convince a jury that he was the victim of unlawful discrimination. Plaintiff constructs this mosaic of several types of evidence: 1) suspicious timing and ambiguous oral or written statements from which an inference of discriminatory intent might be drawn; 2) that he was replaced by a similarly situated person not in the protected class, and 3) that Defendant's stated reasons for the difference in treatment is unworthy of belief, a mere pretext for discrimination.

First, Shaw's statement to McNally that he should seek professional counseling, in the very same conversation in which Shaw terminated McNally and in context with Lipking's expression of concern for how McNally was doing, creates an inference that Shaw regarded McNally as suffering from a mental impairment for which Shaw terminated him.

McNally did not receive any warning whatsoever, either on attendance or about his use of his manager comp. Defendant had an attendance policy under which employees were permitted to accumulate points for violation before disciplinary action was taken. McNally had not been

assessed any attendance points. While Defendant argues that McNally did not notify Shaw when he was going to be off property, Defendant's expectations of McNally on this point are unclear. Shaw admits that McNally did not have set hours. He instructed directors to inform him if they were going to be gone for "extended periods," and it was acceptable if McNally let someone else know that he was leaving. Yet Shaw only checked with McNally's administrative assistant and manager as to McNally's whereabouts if he saw them. An employer may not make unreasonable expectations, and must make the employee aware of just what his expectations are. *Huhn v. Koehring Co.*, 718 F.2d 239, 244 (7th Cir. 1983). Shaw did not make McNally aware of just what he expected of McNally with regards to his attendance, and cannot now decide that McNally did not meet his previously unstated expectations.

  Shaw also did not warn McNally that he was using his comps improperly. Most directors did not write the names of who was in attendance or the reason the a comp was being used on their comp receipts, and there was no written policy requiring them to do so. Nonetheless, the *only* time Shaw determined that a director comp was not used for a reasonable business expense was McNally's comp of a group including employees and former employees celebrating a former employee's birthday on July 28, 2011. This was despite the fact that only a month before, Shaw had comped appetizers and drinks members of the senior leadership team and guests, and two other directors comped drinks for various groups of people. Neither these directors, nor any of the other directors who submitted comp receipts without noting the individuals present or the reason for the comp received discipline. Other directors who Shaw did not perceive as disabled received better treatment that did McNally.

  While Defendant claims that one of the reasons it terminated McNally was "his failure to

cooperate in an investigation," it has provided no evidence to support this claim. McNally mistakenly wrote a vendor's name on a receipt, and explained his mistake immediately when Shaw questioned him about it. Defendant's statements as to why McNally was terminated, when other directors who did not write names of individuals involved or reasons for their comps were not disciplined, are unworthy of belief, and mere pretext for discrimination. Finally, Defendant is not aware of any impairment which McNally's replacement, Carl Guerry, suffers from. These facts paint a convincing mosaic of evidence from which a jury could reasonably infer that Defendant discriminated against McNally due to its perception that he was disabled.

### C. Plaintiff Can Prove His ADA Claim Under the Indirect Method of Proof

Under the indirect method of proof, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) he is disabled under the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably. *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011), reh'g denied. In a discrimination case involving a termination, the fourth prong of plaintiff's *prima facie* case under indirect method is to show that the employer sought a replacement for the plaintiff. *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir. 1994); *Moser v. Tyson Foods, Inc.,* .2010 WL 1382118, *2, n.2 (N.D.Ind. March 29, 2010).

Once a plaintiff has established a *prima facie* case, the defendant must identify a legitimate, non-discriminatory reason for its employment decision. *Rooney v. Koch Air, LLC,* 410 F.3d 376, 381 (7th Cir.2005). If the defendant satisfies this requirement, the plaintiff must then

prove by a preponderance of the evidence that the defendant's reasons are pretextual. *Id.*

As more fully set forth above, Shaw's statement to McNally that he should seek professional counseling, in the very same conversation in which Shaw terminated McNally and in context with Lipking's expression of concern for how McNally was doing creates an inference that Shaw regarded McNally as suffering from a mental impairment for which Shaw terminated him. McNally never received *any* warnings from Shaw, and Shaw gave him a bonus in 2010 for his good work, indicating that McNally was meeting Defendant's reasonable expectations of employment. It is undisputed that Defendant terminated McNally on August 4, 2011, thus suffering an adverse action. Finally, Defendant replaced McNally with an employee it did not regard as disabled. McNally has established his *prima facie* case.

McNally has also shown that Defendant's proffered reasons for terminating him are pretextual. Defendant fails to designate any evidence to support its proffered reason that McNally failed to cooperate with an investigation. It is undisputed that as soon as Shaw asked him about the fact that McNally wrote "Shekell" on the receipt, McNally explained that he had been talking to the bartender about the air conditioning project Shekell was working on and mistakenly wrote the name that was on his mind. Defendant had no policy requiring directors to write names of individuals present and the reason for the comp on the receipt, other directors did not do so, and Shaw himself had comped a large group of individuals' appetizers and drinks and allowed other directors to do so only a month before McNally did. The *only* time Shaw ever found a comp to be for non-business related reasons is McNally's use of his comp on July 28, 2011, and he immediately terminated McNally for it, without warning. This is more than sufficient evidence to show that this reason proffered by Defendant is not worthy of belief, and

not the real reason Defendant terminated him.  In other words, a reasonable jury might conclude from this evidence that Defendant did not "honestly believe the reasons it has offered for the discharge." *Hitchcock v. Angel Corps., Inc.,* 718 F.3d 733, 740 (7th Cir. 2013).

With regard to the attendance issue, Defendant argues, contrary to the designated evidence, that McNally admitted that it was Shaw's expectation that McNally advise him of *any* absence.  It goes on to claim that McNally admittedly failed to inform Shaw of a need to be absent from the Aztar facilities during an extended part of the work day on several occasions prior to his termination.  These contentions are false.  McNally and Shaw agree that McNally had no set hours.  Shaw's only instruction to directors was to let him know if they were going to be off property for extended periods during the workday, without explanation as to what was meant by "extended," and he admitted that it was acceptable to notify *someone* who might get word to Shaw if Shaw was unavailable.

McNally testified that he told Shaw's administrative assistant, his own administrative assistant, or his manager when he had to leave the property.  Shaw, however, did not ask these individuals where McNally was when he was looking for McNally.  Nor did Shaw ever warn McNally about his attendance.  Moreover, Shaw doesn't know whether the cameras cover the entire area McNally was responsible for, and the recordings which Shaw relied upon in determining that McNally left the property without notifying anyone no longer exists.  There is more than sufficient evidence to indicate that Defendant's proffered reasons for terminating McNally are pretext for unlawful discrimination.

**D. Spoilation of Evidence**

Plaintiff requested, in his Requests for Production to Defendant, documents (defined to include video tapes) regarding his employment with Defendant and the allegations of the Complaint. [Pl. Ex. 7, Nos. 1, 2, 8, 13, 19, 21]. Defendant has designated Ward Shaw's testimony that he relied upon the facilities' surveillance footage in determining that McNally had improperly left the work are. [Deft's Br., pp. 4-6, ¶¶ 15-18, 22, 23]. Defendant failed to produce the recordings, so Plaintiff's counsel made a specific request for them on February 12, 2013. [Pl. Ex. 8]. Shaw did not keep the compilation of clips that he viewed, and did not know if Defendant still had it. [Shaw dep., pp. 40-41]. Nonetheless, Defendant never produced the recordings. The duty to preserve evidence attaches at the time that litigation is reasonably anticipated; at that time, Defendant must suspend their routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents. *Doe v. Norwalk Community College*, D.Conn.2007, 248 F.R.D. 372. McNally filed his Charge of Discrimination with the EEOC on October 7, 2011, little more than two months after his termination. By that time, Defendant could have reasonably anticipated litigation in this case. Based upon these facts, a jury could infer that Defendant intentionally destroyed the recordings in order to avoid liability. See *Estate of LeMay by LeMay v. Eli Lily & Co.*, 960 F. Supp. 183, 186 (E.D. Wis. 1997). Plaintiff is entitled to an inference, at this stage, that the recordings would *not* have displayed the information which Defendant claims they did.

**VI. CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.

        Respectfully Submitted,

        */s/Paul A. Logan*
        John H. Haskin
        Paul A. Logan
        JOHN H. HASKIN & ASSOCIATES
        255 North Alabama Street
        Indianapolis, Indiana 46204

        Attorneys for Plaintiff, Michael McNally

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2013, a copy of the foregoing was filed electronically. Parties may access this filing through the Court's system. Notice of this filing will be sent to the following counsel of record by operation of the Court's electronic filing system.

    Jean Marie Blanton      jblanton@zsws.com
    Patrick A. Shoulders     pshoulders@zsws.com
    Rhett David Gonterman  rgonterman@zsws.com
    ZIEMER STAYMAN WEITZEL & SHOULDERS LLP

        */s/ Paul A. Logan*
        Paul A. Logan